UNITED STATES' DISTRICT COURT
FOR THE DISTRICT OF MARYLAND - BALTIMORE

CIVIL DOCKET NUMBER:

FILED ___ ENTERED
LOGGED ___ RECEIVED

JKB11CV1639

JUN 13 2011

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND          DEPUTY

CHUKWUMA E AZUBUKO
Plaintiff

V

1   TOWN OF BROOKLINE PUBLIC SCHOOLS SUPERINTENDENT – IN INDIVIDUAL & OFFICIAL ...

2   TOWN OF BROOKLINE PUBLIC SCHOOLS REGISTRAR – IN INDIVIDUAL & OFFICIAL CAPACITIES

3   TOWN OF BROOKLINE ATTORNEY (MURPHY) – IN INDIVIDUAL AND OFFICIAL CAPACITIES

4   MASSACHUSETTS' COMMISSIONER OF EDUCATION – IN OFFICIAL AND OFFICIAL CAPACITIES

5   MASSACHUSETTS' ATTORNEY GENERAL – IN INDIVIDUAL AND OFFICIAL CAPACITIES and

6   MASSACHUSETTS' LEGISLATORS – IN INDIVIDUAL AND OFFICIAL CAPACITIES
Defendants

## COMPLAINT

### BACKGROUND

Importantly, no one should expect to be regarded as "A friend of human race" when s/he closed her/his eye to societal eye-sore injustice when s/he was living. An excerpt read: "But let justice roll on like rivers, And righteousness like a mighty stream." [Amos 5:24] Without digressing, the Plaintiff contacted the first Defendant on September 10th – 2008 about the possibility of his son's admission into 12th grade into Brookline's Public Schools. The Plaintiff contacted the second Defendant earlier – on the 9th. The Plaintiff spoke with the third Defendant on the 12th at 2.20 P.M. The so-called recherché feedback from the Defendants spoke with was that the admission was impossible, because the Plaintiff was not a <u>resident</u> of Brookline. The Plaintiff disclosed that he worked in Brookline as a Taxi Driver for a company in Brookline. They were not assuaged with that or that did not trigger off recantation of the unlawful and morally bankrupt stance vis-à-vis the criteria for the admission of the Plaintiff's son. The Plaintiff considered it advisable to provide the first Defendant with relevant sources of

1

law, which contradicted or conflicted with the so-called residential and employment *desiderata*. Despite the earnest effort, the first Defendant and her colleagues did not deem it advisable to modify their unlawful or unconstitutional deprivation decision. For the unfavorable decision, the Plaintiff deemed it judicious to borrow money from friends to send his son to an out-of-state private school he attended in 2007/2008 academic year. The Plaintiff's son used to go to the METCO's program at Lincoln/Sudbury Regional High School. He ceased to attend for school's officials unnecessary disciplinary actions without Due Process Clause [adherence] He transferred to Boston's Public Schools – Another Course to College – Brighton, MA 02135. Regrettably, the school's officials knowingly and discriminatorily preferred so-called criminal charges against him – possession of firearm (pellet gun) – amongst other nonsensical charges. Glory, the charges were dismissed by Commonwealth for want of prosecution. That never mitigated the fact that the Defendants in/directly caused the Plaintiff's son not to attend a school in Massachusetts, because the Plaintiff was not a resident and/or employee of a town - Brookline. That was flatly unconstitutional: the constitution provided for "Liberty of contract." [14th Amendment] The residential qualification should not be dissociated from "hereditary" or "transmissible" approach towards determination of who got what, how and when. [Mass. Const. Article VI] Whatever federal's and state's law/s, which supported the residential K-12 admission processes flatly violated the law too - constitutionally and statutorily. [Mass. Const. VI and VII; 20 USC Sections 1011, 1221-1, 1683, 1687 42 U.S.C. Section 1981-83 and 2000d; 34 CFR Part 100; ...] When the Defendants cited the statutory law, which underscored their unfavorable decision against the Plaintiff, then, the Plaintiff would provide counter law too. Worst case scenario, there would be conflict of law and the Plaintiff should get 51% for *substantial reliance*.

Education had been deemed as a protectable constitutional right: it encompassed property and liberty interests if not life interest: the Defendants amongst others systematically chronically deprived monumental opportunities to other citizenry of United States under the color of law the liberty, property and life associated with it, thus: 'Where you are born is where you will grow up, die and be buried.' That accentuated **"Thus passes away the glory of the world."** That cancerous and unhealthy policy never prevailed at post-secondary school education stage.

Why? If it were so pleasant or useful at K-12, then, it should prevail or be institutionalized at post-secondary school levels. In essence, Massachusetts' colleges and universities should adopt restrictive geographical admission policy. It should be so, in a manner of speaking. Glory, it was not so at post-secondary school levels and should not be so at K-12 level. Such policy resoundingly violated *laissez faire* or free-enterprise doctrine, which United States was a pioneer or a leading crusader or was proverbially a professor of. The K-12 admissions confinement to mainly residential qualification distorted or diminished the truest meanings of "liberty." There should be no diminution to reasonable liberty under democratic dispensation. Whatever law in Massachusetts, which affirmed hegemonistic, hereditary and discriminatory tendencies thunderously cried for emergency review, because it was ostensibly narrow-minded, vacuous, callous, vulturic, reprehensible and Jezebel-like. From humble economics background of the Plaintiff, he could predict the superfluous "common good" to the society when the Berlin Wall fell or gate-keeping attitude terminated. The history of the Berlin Wall supportive law/s should be re-examined. Certainly, the Legislators then did not represent cross-section of the society. The policy was diametrically ignorant of the iconic United States' history of the Boston Tea Party Act – 1773 – which would not be dissociated from British Government and monopolist East Indian Company wholesale unjust enrichment. The unfavorable educational policy markedly deviated from Massachusetts' Constitution, let alone the United States' Constitution. [Mass. Const. Preamble – second paragraph last phrase; Mass. Const. Articles VI, VII and XII; MGLc 12 Sections 11H-11J; 42 USC Sections 1091-6] What the Plaintiff drove at socio-psychologically could be vexing and worrisome to those who were unfairly favored. If considered iconoclastic, fine, indeed! Of course, "Change is good." However, the Plaintiff's succinct responses would be, thus: "Touch the sorest point with the sweetest terms" and "The sowers' seeds used to be somebody's crops." When the Plaintiff worked, he duly paid his progressive income taxes – State and Federal. The Plaintiff paid sales tax and user's fee on many things; the payments trickled down to Brookline, thus specific and general grants fro higher echelon of government. On being self-employed, the Plaintiff paid even more thus, daily fluctuated hidden gasoline tax. The payments went to Massachusetts and the Town of Brookline as one of her municipalities irrefutably benefitted. Simultaneously,

the Defendants indirectly knowingly denied the Plaintiff's son access to a school he contributed towards its financing. Was that fair? The Defendants should feel their ears burning! There should be one tongue in one mouth and not two, indeed. Besides, it was commonly saidL "… One Nation, … With Liberty And Justice For All." It would be monumentally unfair and inhumane for one to financing something and one would not benefit from what it. The Defendants should feel their ears burning or imagined themselves to be in the Plaintiff's position. In civilized societies of human origins, law perfectly analogized the maxim of "Our native land is the common parent of us." [Cicero] The institutionalization of the systematic cruel policy for years under the color of the law as if it were *Acta Sanctorum* or *Deeds of the Saints* lent itself to countless negative or/and electrifying conclusions. The Legislators, who enacted or supported the corrosive law, which affirmed "Separate, but equal" hitherto in Massachusetts despite *Brown v. Board of Education* (1957) had <u>competent</u> knowledge of law and not <u>outstanding</u>. They had no modicum of respect for "Dignity of Man," which was the essence of Eight Amendment. The heart-rending and nauseatic law represented taciturnity on abuse; they should be mandatory reporter as Massachusetts' law provided, but "See no evil and hear no evil" propensities to the societal ills prevailed. Such dastardly law lent itself to numberless negative conclusions. Evidently, the Legislators knew not the meanings of "Truth never perishes," "Truth hates delay" and "Truth will set you free." Or, they knew and elected to drawing in their horns or considered it advisable to thinking less critically and creatively than they were naturally endowed or could exert themselves in preservation of the "… hereditary or transmissible to children, or descendants or relations by blood, the idea of a man born a magistrate, lawgiver, or judge, is absurd and unnatural." [Mass. Const. Article VI] The fifth Defendant should know better! Sadly, negligence prevailed in violations of the law with equanimity. [18 U.S.C. Sections 241, 242 and 245; 42 U.S.C. Sections 1981-86] Glory, Title 42 U.S.C. Section 1986 was entitled "Action for neglect to prevent." Other Massachusetts' law violations attached too! [MGLc 249 section 9; MGLc 258 Sections 1-13; MGLc 258E] The heart-rending law typified masters-servants or peonagistic relationship, though considered an Act of God or humane. The de facto law represented torture and racketeering! [18 USC Sections 2340-2340B; 18 USC Sections 1961-68] Under democratic dispensation and the global crusade

4

for duly respect for human rights emanating from United States, the defective system should be condemned and re-organized. The proceedings had bearings on *Veritas Lux Mea* or "Truth Is My Light." If incorporated into legislation or policy formulations, the pigs would be wingnized or flew. With candor in communications, it would be useful and helpful, at all material times!

**PARTIES**

The Plaintiff had been a resident of Massachusetts for upwards of 26-year. The Plaintiff used to work for the Boston's Public Schools as a [Substitute] Teacher, though with master degree in education (secondary school concentration with Massachusetts' certification on social studies (7-12) and business management (7-12)). The Plaintiff had been self-employed – transportation – from 1995, though unemployed presently owing to circumstances beyond the Plaintiff's control. The Plaintiff's contact information was as stated *infra* or below. The first three Defendants were employees of the Town of Brookline with common address as Old Lincoln School, 194 Boylston Street (Rout 9), 3rd Floor, Brookline – MA 02445. The fourth Defendant had his mailing address as 350 Main Street, Malden – MA 02148. The fifth Defendant had her mailing address as One Ashburton Place, Boston – MA 02108. The sixth Defendants had their address as – 24 Beacon Street, Massachusetts State House, Boston – MA 02133.

**JURISDICTION**

The Court had *in personam* and subject matter jurisdiction; the sub-head existed conspicuously on constitutionally, statutorily and procedural ly. [Article III Sections 1 and 2; First Amendment; Eight Amendment; 13th Amendment and 14th Amendment – "Liberty of Contract"; 15 U.S.C. Sections 1, 2, 4, 7 ...; 18 U.S.C. Sections 241, 242 and 245; 28 U.S.C. 1331, 1346, 1361 and 1367; 20 U.S.C. Sections, 1011, 1221-1}, 1683, 1685, 1703, 1706 and 1720 (c); 42 U.S.C. Sections 1981-88, 2000a, 2000a-1-6, 2000b-2, 2000c-8 and 2000d and 2000d-1-7; Fed. R. 4 (e); 4(h) (2-3), (j)(2) and (k); Massachusetts' Constitution – Articles IV, VI, VII X, XI and XXIX; M.G.L.c. 12 Sections 11H-11J; M.G.L.c. 15 Sections 1-1J; M.G.L.c. 93 Sections 1-6, 10 and 14A ...; M.G.L.c. 93A; M. G. L.c. 151C Sections 1-3; M.G.L.c. 151B; **M.G.L.c. 231 Section 85X**; M.G.L.c. 249 Section 9; **M.G.L.c. 265 Sections 37 and 39**] Those would be the bases for the head.



**01)   DENIAL OF LIBERTY OF CONTRACT - 14TH AMENDMENT**

The conduct of the [first three] Defendants resonated with or underscored the sub-head superfluously. The Plaintiff needed not to particularize unreasonably on that. In brief, what it meant was self-explanatory or should be readily understood.

**02)   DEPRIVATION OF EQUAL PROTECTION AND DUE PROCESS CLAUSES**

On those striking constitutional doctrines, the focus should be on the 14th Amendment. Of course, deprivation of property and liberty interests constitutionally underscored the sub-head/s devoid of procedural right. The proceedings matched with the sub-head/s multifariously! Striking amongst them would be Title 42 Section 2000c-8 entitled "Public Education" and sub-titled "Personal suits for relief against discrimination in public education." The Plaintiff was neither provided with pre- nor post-deprivation hearings as legally stipulated.

**03)   RESIDENTIAL AND EMPLOYMENT QUALIFICATIONS AND QUO WARRANTO**

The [first three] Defendants arrogated critical and creative legal thinkings monopoly to themselves. Glory and in all modesty, they encoded and the Plaintiff decoded! What law underscored the proverbial misconstrued and unlawful residential and the Town of Brookline employment criteria for K-12 admission? Going with the stream, indeed! The policy/law irrespective of statutory provisions resoundingly violated Massachusetts' Constitution – Articles VI, VII and X; 14th Amendment -"Liberty" and "Liberty of contract." Statutory law under normal circumstance should not be <u>superior</u> to constitutional law. The 14th Amendment's "Liberty of Contract" spoke for itself, at all material times. Admittedly, hypocrisy existed: the unconstitutional methodology applied not to Massachusetts' public colleges' and universities' admissions. If it were not so, then, "liberty" should reign unimpeded and unreservedly or without diminution for K-12 admissions! The residential restriction at primary and secondary education levels epitomized game of intelligence and perpetuation of poverty in some quarters. A wise wo/man closed the stable before the horse would be stolen. The gate-keeping attitude at fundamental educational developmental stages if eliminated would underscore the <u>truest</u> meanings of "common good" or "liberty " as found in the matchless Massachusetts' and United States' Constitutions. The importance of *Utilitarianism* and "The law of comparative advantages" according to philosophers and economists would not be over-emphasized. The stone, which covered Christ's tomb, should be removed expeditiously for the benefit of all as scientifically enshrined in law. It would really mirror upon " ... One nation, With Liberty And Justice for all" pledge. The Berlin Wall law presently resembled "Don't ask; "Don't tell" discriminatory saga in the military. Glory, it had been recently annulled, though with cautious or restrictive implementation.  Whatever law, which warranted such

unusual cruelty, conflicted with other superior law! Massachusetts had laws entitled "Unlawful discrimination" and "Civil rights, violation of constitutional rights [and punishment." [M.G.L.c. 151B; M.G.L.c. 12, Sections 11H-11J; MGLc 265 Sections 37 and 39] The Plaintiff needed not to dissect all relevant Massachusetts' law on the sub-head; other law existed and striking ones would be "Regulation of Trade and Certain Enterprises" and "Regulation of Business Practices for Consumer Protection." [M.G.L.c. 93 and 93A *supra*]

### 04) VIOLATION OF FEDERALLY ASSISTED PROGRAMS OR TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 SECTIONS 2000d AND CODE OF FEDERAL REGULATIONS (CFR) 100.1 100.2 AND 100.3

The so-called that and those qualifications for the admission markedly deviated from the Massachusetts' and United States' Constitutions. Massachusetts' statutory law in favor of the residential qualification conflicted with countless Massachusetts' and Federal's Law. [14th Amendment - Liberty; 42 U.S.C. *supra*; Mass. Const. VI, VII and X; Mass. Const. Preamble – sec. par. phrase; M.G.L.c. 151B] Of course, plethora of law existed to the contrary.

### 05) USAGE OF BROOKLINE'S EMPLOYMENT AS AN ADMISSION CRITERION NEGLIGENT

The Plaintiff was pointedly told [over the telephone] by the first three Defendants that the admission of his son would have been feasible if the Plaintiff were an employee of the Town of Brookline. That sounded delusional and electrifying! The Plaintiff never knew that distinction had to be made between *public* and *private* employees prior to enjoyment of one's irreducible minimum constitutional rights or unquestionable "Federally Protected Activities." [18 USC Section 245] Such mindset was indisputably unconstitutional and/or unlawful! Reiteratively, the Plaintiff worked in Brookline with a private company. The Plaintiff generated about $36,000.00 per annum, thus cab leasings and excluding deduction from credit card charge - .0525%. If taxation were executed disinterestedly, the Plaintiff contributed towards public education in Brookline, but his son could not attend school in Brookline just for a year or benefitted from what he significantly contributed towards its financing. No one, who understood the workings of the law, would smile at such tangible notorious deprivation propensity. Again, the Plaintiff paid Massachusetts' income tax when employed; he also paid skyrocket sales tax on gasoline on daily basis amongst others: users' fees were substantial - to the Registry of Motor Vehicles, tolls, telephones, electricity, gas, *et cetera*. Scientifically or indisputably, Brookline Public Schools enjoyed the financial contributions of the Plaintiff in/directly. Then, "How large is large?" Deprivation of the school's services central to being a non-resident and a non-employee of the Town of Brookline was callous and unlawful. That sounded diametrically illogical if not vulturic. Reiteratively, the Plaintiff knew neither Massachusetts' nor United States' law, which justified financing without benefitting

condemnation: that was an insidious and an invidious educational deprivation stance and it thunderously justifiably cried for judicial annulment expeditiously. Of course, when the Courts spoke, even the deaf had to listen, at all material times.

**06)   VIOLATION OF 42 SECTION 1981(a-b) OR DEPRIVATION OF PROPERTY AND LIBERTY INTERESTS**

The Plaintiff was not the author of "Statement of equal rights" and "Make and enforce contracts" defined. [Exhibit 1] The Defendants' reprehensible K-12 admission qualifications demand – residential and employment – precipitated the Plaintiff into unjustifiable financial hardship. The Plaintiff expended about $5,300.00 borrowed money for his son's education for that semester and subsequent ones. The Defendants' negligence had bearings on *but for* and *undue influence* doctrines.

**07)   THE MASSACHUSETTS' GENERAL LAW CHAPTER 76 SECTION 5 AND *CONFLICT OF LAW***

Importantly, the fourth, fifth and sixth Defendants were included in the proceedings, because of the sub-head. The said law was no better than Jim Crow laws. Unexaggeratedly, education under federal system fell into *concurrent list or classification* - Federal, States and Municipalities – contributed towards the financings. It would not be classified under *residual* list -municipalities' controllings/financings only. The scope of benefit made it looked so! These Towns, which the said law aimed at protecting for eternity, had predominantly as their residents those who in/directly benefitted hugely from *free labor of* Africa's *Slaves* immeasurably and those deprived the opportunity were mainly African descents and others. The striking *unjust enrichments* that flew from that were self-explanatory. In fact, the unconscionability and unusual cruelty were very obvious! The Towns were built with free Slaves' labor. Sadly, within the period, socio-economic unusual cruelty was unashamedly institutionalized. Slavery had been allegedly abolished in United States in theory, but it was judicious to insulating the unfair beneficiaries with cancerous, retrogressive, apartheid-like, undemocratic, dehumanized and irresponsible law. Of the striking law was "Balance Not Required" and "Assignment on Neighborhood Basis not a Denial of Equal Education Opportunity." [Title 20 Sections 1704 and 1705] The law aimed at [constructive] ostracization of those who were immeasurably adversely affected by the societal well-institutionalized unholy. de facto and Pharaoh-like policies vis-à-vis human development amongst others. It should not be forgotten that slavery entailed deprivation of Africans who were brought to the United States the opportunities for education, dignified employment, property acquisition, *et cetera*. It epitomized total peonagism or insidious condemnation to *chattel* – moveable personal property. More, the Slaves were *de jure* chattel or were considered as permissible property to their so-called Masters – the Ancestors of those who benefitted hugely from the unfair and discriminatory education law without moral qualm. Whoever doubted the atrocities of Slavery should find time to research on it. [Senator

Sumner, Charles, "The Barbarism of Slavery: Summary of Slavery's Five Characteristics," (Washington, DC: 4th June 1860)] It was likenable to a Chief of Police knowing that criminals used the basement of the police headquarters for sharing their loots and s/he went on saying that her/his department needed more money to preventing or fighting [armed] robbery.  Such condescension represented numberless negative conclusions. S/he should tell that to the marines, indeed! It meant construction of realities too! A reasonable and prudent person would ask thus. "How large is large?" Furthermore, "If the salt lost its taste, what would be done for its restoration?" That stance violated morality and aw! [Eight Amendment - unusual cruelty; 13th Amendment] Some of the discriminatory Legislators understood the cancerous or unfair nature of the lodestar education law and remorsed, thus creation of Metropolitan Council for Education Opportunity (METCO) in 1966 by the Massachusetts' Department of Education (DOE) for Boston's and Springfield's deprived students – ill racial discrimination mitigation measure. In essence, the program, which the DOE paid for made it possible for students from the above-mentioned towns amongst others to attending suburban public schools on sufferance or restrictive permission. Succinctly, the apartheid-like law was never enacted with *good- faith*. In essence, METCO was inaugurated to mitigate the notorious and condemnable impacts of slavery to African Slaves' descendants and other deprived groups in Massachusetts who predominantly resided impoverished cities' catchment. Candidly, the law necessitated annulment with immediate effect: it thunderously cried for humane attention given prevailed Judeo-Christian ideology in United States.  Truly, the Plaintiff cried not for the judicial moon, thus commencement of the proceedings. It represented substantial understandings of economics and law. The socio-economic benefits would be more than dreaded.

**08)      DIMINUTION TO MEANINGS OF LIBERTY INTEREST OR "LIBERTY OF CONTRACT"**

The focus should be on the 14th Amendment. Whatever law, which justified "Separate, but equal" after the proverbial *Brown v. Board of Education*, 347 U.S. 483 (1954) precedent flew in the faces of unequaled or unique Massachusetts' and United States' Constitutions. Africans forced into slavery in United States had no education: their deprivation of education was *de jure* in Massachusetts amongst others: the inhuman policy had socio-economic timeless or forever mercurial unfavorable consequences. Certainly, life would be meaningless without education. The earnings power or consumption frontiers of wo/men with education would not be the same vis-a-vis those without education. That was as plain as the nose had been on the face! Suddenly, the Slaves became free, in a manner of speaking and ill-prepared for the type of competitions they were juxtaposed socio-economically - capitalism. Sane, sensitive and altruistic Legislators should not enact or affirmed a Berlin Wall-like law, which restricted their fellow-citizenry educational liberty – K-12. It flouted the maxim of

"All men are created equal" as enshrined in Massachusetts and United States' Constitutions. What prevailed represents ideological histrionic or insincerity. The vulturic policy was reminiscent of individuals who climbed up and elected to remove the ladders they used. That was a condemnable mannerism. [Jeremiah 22:13] It justified the Bible's proverbial fig tree saga. [Matthew 21:18-22] The putrid mindset had bearings on 'Where you are born, is where you will grow, die and be buried.' Such reprehensible maxim was false and irrational, at a time "Global Village" was broached upon on socio-economic decisions the world over. The importance of primary and secondary education would not be over-emphasized. The foundations of higher education were laid at those stages of education. The quality of primary and secondary education could make or mar higher education pursuit. What were the Legislators driving at, thus prevalence of deprivation/insulated or balkanized educational law? The restrictive law on primary and secondary schools stages should be eliminated. The law sign-posted moral bankruptcy/corrosion and tergiversation or hypocrisy. It defied logic that the Defendants did not notice the visible cancerous law and repealed it without time wasting. Of course, "Appropriate adults should not be home and allowed she-goat to be under labor leashed." In essence, the maximum rather optimum reverence accorded to women under labor should be extended to other she-animals when similarly situated, at all material times. The Defendants had praiseworthy education and they should have known better: sadly, they failed woefully and ironically. They had the intellectual power and they failed woefully to use it for common good! Why? Life, liberty and property were not mentioned in the Massachusetts' Constitution Preamble. Nonetheless, they were mentioned in the United States' Constitution under Fifth and Fourteenth Amendments. On the second paragraph of Massachusetts' Constitution Preamble , "common good" and "equitable mode of making laws, ..." were used. The Defendants' negligence markedly deviated from the precepts. The Plaintiff would knowingly desist from definition of *negligence* and *lack of skill*. *Pupils' convenient schools attendance should determine enrollment and not residen*ce or *employment vis-à-vis capitalism proverbial ismin United States.*

**09)    DEFENDANTS STARK VIOLATION OF MASSACHUSETTS' CONSTITUTION**

The Defendants questionable permission of residential and employment criteria for K-12 admissions violated the law resoundingly – Massachusetts' Constitution. [Part The First: Articles VI and VII] They read respectively, thus:

"No man, nor corporation, or association of men, have any other title to obtain advantages, or particular and exclusive privileges, distinct from those of the community, than what arises from the consideration of services rendered to the public; and this title being in nature neither hereditary, nor transmissible to children, or descendants, or relations by blood, the idea of a man born a magistrate, lawgiver, or judge, is absurd and unnatural" and

"Government is instituted for the common good; for the protection, safety, prosperity and happiness of the people; and not for the profit, honor, or private interest of any one man, family, or class of men. Therefore the people alone have an incontestable, unalienable, and indefeasible right to institute government; and to reform, alter, or totally change the same, when their protection, safety, prosperity and happiness require it."

**10)   OVERT INTENTIONAL DISCRIMINATION**

The Defendants knowingly deprived the Plaintiff's son access to the Brooklime's Public Schools in the name of residential and employment *desiderata*. The Plaintiff was told by a/n Haitian friend that he telephoned and discussed with the Brookline's Public Schools employee about his child's school attendance. He was told that he had to work for about six-year in Brookline for his child/ren admission fruition into K-12. To him, residential qualification was waived. The Plaintiff did not get such a favorable offer. Those similarly situated should be treated evenly. Not doing so underscored the sub-head. It was unlawful too! [M.G.L.c. 151B]

**11)   TRESPASSERS OF THE LAW**

An excerpt on that read, thus:

"Under Federal law which is applicable to all states, the U.S. Supreme Court stated that if a court is "without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void; and form no bar to a recovery sought, even prior to a reversal in opposition to them. They constitute no justification; and all persons concerned in executing such judgments or sentences, are considered, in law, as trespassers." [*Elliot v. Piersol*, 1 Pet. 328, 340, 26 U.S. 328, 340 (1828)]

**12)   INTENTIONAL VIOLATION OF OATH OF OFFICE**

On that, an excerpt read:

"I do solemnly swear (or affirm, as the case may be), that I will support the constitution of the United States and the constitution of the state of Massachusetts, and that I will faithfully discharge the duties of the office of …… to the best of my ability."

**13)   "FAILURE TO TRAIN AS A THEORY OF SECTION 1983 LIABILITY IN THE … CIRCUIT"**

The sub-head's truncated excerpt read:

"Title 42 U.S.C. Section 1983 has developed to the point that it provides a remedy for the violation of federally-protected rights by governments and its employees. That was not always the case, however. Enacted in 1871, the statute fell into almost a century of disuse, as the Supreme Court construed its reach very narrowly. See Civil Rights Cases, 109 U.S. 3, 3 S. Ct. 18 (1883)…"

**14)   CONSPIRACY AGAINST RIGHTS [18 U.S.C. SECTION 241]**

The Defendants negligence qualified indisputably for the sub-head. The truncated excerpt read, thus:

This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same)..."

### 15)  "DEPRIVATION OF RIGHTS UNDER COLOR OF LAW" [18 U.S.C. SECTION 242]

Additionally, its shortened excerpts read, thus:

"This statute makes it a crime for any person acting under color of law, statute, ordinance, regulation, or custom to willfully deprive or cause to be deprived from any person those rights, privileges, or immunities secured or protected by the Constitution and laws of the U.S."

"This law further prohibits a person acting under color of law, statute, ordinance, regulation or custom to willfully subject or cause to be subjected any person to different punishments, pains, or penalties, than those prescribed for punishment of citizens on account of such person being an alien or by reason of his/her color or race."

"Acts under "color of any law" include acts not only done by federal, state, or local officials within the bounds or limits of their lawful authority, but also acts done without and beyond the bounds of their lawful authority; provided that, in order for unlawful acts of any official to be done under "color of any law," the unlawful acts must be done while such official is purporting or pretending to act in the performance of his/her official duties. This definition includes, in addition to law enforcement officials, individuals such as Mayors, Council persons, Judges, Nursing Home Proprietors, Security Guards, etc., persons who are bound by laws, statutes ordinances, or customs."

**PLAINTIFF: RELIEVES SOUGHT**

The Plaintiff prayed the Court to issue a *permanent injunction* to the Defendants to promptly annul the Massachusetts' General Law Chapter 76 Section 5 amongst others, which prevented non-residents of any town to attend primary and secondary school s in the town. In essence, the cancerous and unusual cruel law would not be used to denying admissions to those who would be similarly situated with the Plaintiff and his son in future. Secondly, that anyone including Taxi Drivers, residential aides, *et cetera* that worked for a company or for individual/s operating and/or residing in Brookline within six-month if elected can have her/his child/ren attended Brookline's Public Schools devoid of any deprivation, thus residential and employment [qualification] requirements.

**JURY TRIAL**

That prayer hinged not on feelings, but thinkings or associated with the law. [MRCP 38; FRCP 38]

**DAMAGES --COMPENSATORY AND PUNITIVE**

The Plaintiff would seek treble damages as Massachusetts General Law established under Chapter 93 Section 12 - $3m – officially and $1.5m individually. For the sixth Defendants – on individual basis – it

12

would be $25,000.00 per a Legislator in the Massachusetts' State House. Cost, legal fee and interest would be excluded. Interest computation should commence from January 1st – 2010.

_____
CHUKWUMA E AZUBUKO
P O Box 171121
Boston – MA 02117-1351
Telephone: (617) 265 6291

**Dated in Boston – Massachusetts - on Wednesday – July 28th - 2010**

13